**HISPANIC INFORMATION & TELE-COMMUNICATIONS NETWORK, INC., Appellant,**

**v.**

**FEDERAL COMMUNICATIONS COMMISSION, Appellee,**

**Daytona Beach Community College, Intervenor.**

No. 88–1335.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 13, 1988.

Decided Jan. 24, 1989.

Benjamin Perez, with whom Robert E. Kelly was on the brief, for appellant.

Sue Ann Preskill, Counsel, F.C.C., with whom Diane S. Killory, Gen. Counsel and Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., were on the brief, for appellee.

Lawrence M. Miller was on the brief for intervenor.

Before WALD, Chief Judge and ROBINSON and EDWARDS, Circuit Judges.

Opinion for the Court filed by Chief Judge WALD.

WALD, Chief Judge:

This case involves the allocation of franchises in the Instructional Fixed Television Service ("ITFS"). The appellant, Hispanic Information & Telecommunications Network ("HITN"), challenges an order of the Federal Communications Commission ("FCC" or "the Commission"), which dismissed HITN's application and granted an ITFS permit to Daytona Beach Community College ("DBCC"). HITN contends that the Commission misapplied its own rules by granting an absolute preference to the local applicant; that it improperly failed to provide a comparative hearing; that it failed to furnish HITN with notice that a competing application had been filed; and that the grant of more than four channels to DBCC was a violation of FCC regulations. For the most part we conclude that the Commission acted properly. We believe, however, that the agency failed to consider the proper criteria in determining that the DBCC application would not violate the four-channel rule. We therefore remand to the Commission for further consideration of this issue.

## I. FACTS

### A. *History of ITFS*

The Instructional Television Fixed Service was created in 1963. *See Educational*

*Television,* 39 F.C.C. 846 (1963) ("*1963 Report*"), *recon. denied,* 39 F.C.C. 873 (1964). ITFS was designed principally for use by educational institutions: the FCC stated that "the most important function of the new service would be to reach groups of students assembled in classrooms or other similar places for the specific purpose of using the instructional material so transmitted." *1963 Report,* 39 F.C.C. at 846. ITFS uses frequencies which cannot be received on an ordinary television. Instead, the programming is transmitted to specific "receive sites" at which students (or other viewers) are gathered to watch the material. Originally thirty-one channels were allocated to ITFS, see *1963 Report,* 39 F.C.C. at 851.[1] In 1971 this number was reduced to twenty-eight.[2] *See Instructional Television,* 30 F.C.C.2d 197, 200 (1971). The regulation as originally promulgated limited licensees to the use of five channels in a given area, *see 1963 Report,* 39 F.C.C. at 852, 863; in 1966 this limit was reduced to four. *See Instructional Television Fixed Service,* 7 Rad.Reg.2d (P & F) 1768, 1770 (1966).

In the first two decades after the creation of ITFS, the Commission noted both an underutilization of the medium for educational purposes and an increasing demand for the frequencies by other potential users. Most notable among these competitors were providers of programming in the Multipoint Distribution Service ("MDS").[3] In 1983, the Commission reallocated eight channels to MDS use, leaving twenty for ITFS.[4] *See Instructional TV Fixed Service,* 94 F.C.C.2d 1203, 1236–37 (1983). The FCC also liberalized the restrictions on ITFS programming by permitting ITFS stations to lease channel capacity to commercial programmers (such as MDS providers)

during those times when educational programming was not being presented.

These changes were prompted by the Commission's apparent belief that too much of the spectrum had been reserved exclusively for ITFS and that channel capacity was consequently being wasted. Soon afterwards, however, the Commission began to worry that the pendulum might swing too far in the opposite direction. The dramatic increase in ITFS applications prompted by the new leasing rules threatened to squeeze out local educational institutions seeking to provide the programming for which ITFS had originally been intended. The Commission emphasized "that the foundation of the service must continue to be that for which it was designed—the transmission of educational materials to accredited schools for the formal education of students enrolled there." *Further Notice of Proposed Rule Making,* 98 F.C.C.2d 1249, 1252 (1984) ("*Further NPRM*"). Of particular concern was the Commission's observation that "most nonprofit organizations which have applied for ITFS licenses have no local presence in the communities where facilities are sought." *Id.* at 1256. Though the FCC did not wish to exclude nonlocal applicants entirely, it clearly was worried by the prospect that a profusion of such applicants might make it difficult for traditional ITFS providers to obtain frequencies. The Commission therefore requested comments concerning possible means of accommodating local and nonlocal interests. *See Further NPRM,* 98 F.C.C.2d at 1257–58.

The Commission issued its new rules on June 20, 1985. *See Second Report and Order,* 101 F.C.C.2d 50 (1985) ("*1985 Order*"). The rules established a one-year "local priority period" beginning on July

---

1. In the early years of ITFS, these channels were shared with providers of operational fixed service.

2. Although the 1971 rulemaking reduced the number of channels potentially available to ITFS operators, it allocated those channels *exclusively* to ITFS. The other three channels were allocated to operational fixed service.

3. MDS is used primarily for the transmission of entertainment programming. It may be used,

for example, to provide programming to apartment buildings, hotels, or residences which do not receive cable.

4. Channels A1–A4, B1–B4, C1–C4, D1–D4, and G1–G4 are currently allocated to ITFS. Channels E1–E4 and F1–F4 are allocated to MDS, and no new ITFS applications for these frequencies will be accepted. *See* 47 C.F.R. § 74.902.

**1292**

28, 1985. All local applications filed during that period, as well as all local applications pending as of the beginning of that period, would be preferred to any mutually exclusive application filed by a nonlocal entity. Once the local priority period ended, mutually exclusive applicants for remaining frequencies would be compared using a point system. Local applications filed after the priority period would receive points, but would not be automatically preferred to nonlocal competitors.

HITN, along with other parties, sought reconsideration of the Commission's ruling. On March 14, 1986, the Commission issued an order modifying the *1985 Order* in some respects. *See Instructional Television Fixed Service (Reconsideration)*, 59 Rad. Reg.2d (P & F) 1355 (1986) (*"Reconsideration"*). The *Reconsideration* provided that all nonlocal entities whose applications were pending when the local priority period began would be given ninety days to amend their applications to include a local entity within their ownership structures. Applicants who successfully accomplished such amendments would be considered local applicants and could thus compete against other local parties under the comparative criteria. HITN did not seek judicial review of any aspect of the *Reconsideration*.[5]

## B. *The Course of This Proceeding*

Appellant HITN is a New York-based nonprofit educational organization which seeks to provide television programming targeted towards Hispanic viewers. On March 13, 1984, HITN filed an application for an ITFS station in Orlando, Florida which would use stations B1–B4. The application was placed on public notice on March 20, 1984.

On May 22, 1984, Daytona Beach Community College filed an application for an ITFS station in Deland, Florida. The Commission issued a public notice of the filing

on May 29, 1984. The Deland station, as explained in DBCC's application, was intended to serve as part of an integrated ITFS system operating out of four Florida communities in which DBCC campuses are located. The Deland station would use channels B1–B4; the New Smyrna Beach station would use channels G1–G4; the Daytona Beach station would use channels D1–D4; and the Flagler Beach station would use channels B1–B4. Most of the programming would originate out of the Daytona Beach station and would be transmitted to the other three stations; it would then be retransmitted to various receive sites—such as schools and hospitals—in each of the four communities.[6] Occasionally, though, each of the stations would be used to originate programming. The four stations would follow identical programming schedules. Therefore, while the system as a whole would make use of twelve different channels (B1–B4, D1–D4, and G1–G4), only four discrete channels of programming would be presented at any given time.

DBCC's Deland application did contain one misstatement of fact which is relevant to the present dispute. Its application contained the affirmative statement that "[t]here are no B-group stations or applications within 50 miles." Joint Appendix ("J.A.") 4. The engineering firm which compiled DBCC's technical data apparently overlooked HITN's application, filed a short time previously, for a B-group station in Orlando. HITN's proposed Orlando site was located 33.8 miles from the proposed DBCC station in Deland.

Although HITN participated in the Commission's rulemaking proceedings, it heard nothing further about its Orlando application until October of 1986. It was then informed, by letter dated October 7, 1986, that its application had been rejected and that of DBCC accepted. Since the applications were mutually exclusive, since DBCC

---

5. The *Reconsideration* was challenged by other parties, and invalidated in part, on grounds not relevant to the present dispute. *See Telecommunications Research & Action Center v. FCC*, 836 F.2d 1349 (D.C.Cir.1988).

6. Stations which retransmit programming in this fashion are known as "relay" (as opposed to "originating") stations. *See* 47 C.F.R. § 74.931(d).

was a local and HITN a nonlocal applicant, and since HITN had failed to amend its application to substitute a local entity, the FCC's Mass Media Bureau had concluded that DBCC's proposal should be preferred. *See* J.A. 22. HITN petitioned for reconsideration. By letter dated April 28, 1987, the Chief of the Video Services Division denied the petition. *See* J.A. 32–35.

HITN then filed an Application for Review by the FCC. HITN first asserted that the DBCC system violated 47 C.F.R. § 74.902(d), which provides that no licensee may be granted the use of more than four ITFS channels within the same area of operation. HITN also argued that the FCC had misconstrued the local priority rules announced in the *Reconsideration* and that a comparative hearing between the rival applicants was required. On April 6, 1988, the Commission affirmed the dismissal of HITN's application and the grant of the license to DBCC. *Daytona Beach Community College*, 3 F.C.C.Rcd. 1951 (1988). J.A. 84. This appeal followed.

## II. DISCUSSION

### A. *Was the FCC's Ruling Consistent With the Standards Set Forth in the* Reconsideration?

 HITN argues that the Commission's ruling was inconsistent with the standards enunciated in the FCC's *Reconsideration* of its amendments to the ITFS rules.[7] In the original rulemaking—the *1985 Order*—the agency established a one year "local priority period" beginning on July 28, 1985. All qualified local applicants filing for licenses during that year, as well as all qualified local entities whose applications were pending as of the start of that period, would be given priority, and mutually ex-

clusive nonlocal applications would be rejected. The appellant concedes that the standards announced in the *1985 Order* would require that its own application be rejected and DBCC's accepted. HITN contends, however, that the *Reconsideration* modified the local priority period to provide that local applicants would receive a comparative preference, but not an absolute priority, over mutually exclusive nonlocal applicants.

HITN has simply misread the *Reconsideration*. The Commission did provide nonlocal applicants with a three-month opportunity to amend their applications by substituting a local entity. Otherwise, though, the *Reconsideration* left intact the principle that, until the end of the local priority period, local applicants would automatically be chosen over mutually exclusive nonlocal applicants. We believe that the *Reconsideration* unequivocally reaffirmed the earlier decision to establish the local priority period, providing for "the processing and grant of pending and new applications by local entities without competition by nonlocal entities during that time and notwithstanding any mutually exclusive pending nonlocal applications." *Reconsideration*, 59 Rad.Reg.2d (P & F) at 1358.

HITN relies heavily on passages in the *Reconsideration* which state that nonlocal institutions should not be excluded entirely from ITFS licenses. HITN also notes that the Commission has established a point system for comparing applicants and that the system gives points to local applicants. Such a system would make no sense, the petitioner argues, if local entities were to be given an absolute preference. This argument misses the mark. The FCC did recognize that ITFS operation by a nonlo-

7. HITN could have sought judicial review of the rules themselves, as announced in the *Reconsideration*, but chose not to do so. The appellant's counsel conceded at oral argument that HITN is therefore precluded from contesting the validity of the regulations in this proceeding; the appellant's challenge is solely to the FCC's *interpretation* of its own rules. In light of appellant's concession, we need not canvass this circuit's precedents concerning a litigant's right to challenge an underlying regulation within the context of an agency adjudication. *See, e.g., NLRB*

*Union v. FLRA*, 834 F.2d 191 (D.C.Cir.1987) (distinguishing between substantive and procedural challenges); *Aluminum Co. of America v. ICC*, 761 F.2d 746, 751 (D.C.Cir.1985) (noting but not resolving the conflict among circuit precedents concerning "the question whether, in the course of an appeal from an agency decision applying a rule to a specific set of facts, we may entertain a challenge to the rule itself after the jurisdictional deadline for direct review of the rule has expired").

cal entity is better than waiting indefinitely in the hope that a local applicant will appear. The Commission therefore provided that nonlocal applicants would not be excluded entirely, but would be permitted to file for licenses in areas where no local applicants had emerged during the local priority period. By the same token, the point system would be used to compare local and nonlocal applications only *after* the expiration of the local priority period. These provisos are not relevant to the present case, since DBCC's application was pending when the local priority period began. The Commission's resolution of this case was therefore entirely consistent with the standards articulated in the *Reconsideration.*

B. *Was the Commission Required to Hold An* Ashbacker *Comparative Hearing?*

■ In *Ashbacker Radio Co. v. FCC,* 326 U.S. 327, 333, 66 S.Ct. 148, 151, 90 L.Ed. 108 (1945), the Supreme Court held that "where two *bona fide* applications are mutually exclusive the grant of one without a hearing to both deprives the loser of the opportunity which Congress chose to give him" (italics in original). HITN argues that

> [b]y denying HITN and other nonlocal applicants the opportunity for comparative consideration of the merits of their applications, and granting the mutually exclusive applications filed by local applicants, without making a comparative public interest finding among all the pending applicants, the Commission is acting in direct contravention of the holding of the Supreme Court in *Ashbacker.*

Brief for Appellant at 29–30. This claim is without merit. The Communications Act requires a comparative hearing only when "a substantial and material question of fact is presented or the Commission for any reason is unable to make the finding...." 47 U.S.C. § 309(e). The statute does not preclude the FCC from establishing threshold standards to identify qualified applicants and excluding those applicants who plainly fail to meet the standards. As the Supreme Court has stated:

> We do not read the hearing requirement ... as withdrawing from the power of the Commission the rulemaking authority necessary for the orderly conduct of its business.... We do not think Congress intended the Commission to waste time on applications that do not state a valid basis for a hearing.

*United States v. Storer Broadcasting Co.,* 351 U.S. 192, 202, 205, 76 S.Ct. 763, 770, 771, 100 L.Ed. 1081 (1956). This court has also emphasized that deference should be given to the Commission's determinations regarding "[t]he substantiality and materiality of purported issues of fact, and the need for further information." *United States v. FCC,* 652 F.2d 72, 91 n. 87 (D.C. Cir.1980) (en banc).

■ In the present case, the parties agree that HITN is a nonlocal applicant, and DBCC a local one, within the meaning of the Commission's rules. The parties also agree that the applications as filed were mutually exclusive. It therefore seems clear to us that no substantial or material issue of fact remains to be resolved. If granted a hearing, the appellant might seek to convince the Commission that HITN's minority ownership, or the diverse range of its proposed programming, are of greater importance than DBCC's local status. The FCC has already determined, however, after notice and comment, that the public interest will best be served if local applicants are granted an absolute priority for a specified period of time. The Commission surely is not obligated to rethink its policies on each occasion that it applies them to a particular set of facts; this would eviscerate the agency's rulemaking authority. Given the absence of disputed factual issues, no *Ashbacker* hearing is necessary. Such a hearing would either require FCC reconsideration of established policy, or else it would be a pointless formality in which the result was preordained. Nor is the result affected by the fact that HITN's Orlando application was filed prior to the issuance of the FCC *Reconsideration.* The filing of an application creates no vested right to a hearing; if the substantive standards change so that

the applicant is no longer qualified, the application may be dismissed. *See Storer Broadcasting,* 351 U.S. at 197, 76 S.Ct. at 767.

HITN also points out that the pendency of a hearing might induce DBCC to negotiate a compromise which the college would otherwise be unwilling to make. It is certainly possible that HITN would profit from the scheduling of a hearing, even a hearing which it would not expect to win. But to say that HITN might profit if a hearing were scheduled is not to say that the appellant is legally entitled to one. In our view it would be quite bizarre if the Commission were ordered to conduct an otherwise useless hearing simply to provide HITN with additional leverage in its bargaining with a competitor.

### C. *Did HITN Receive Adequate Notice of DBCC's Mutually Exclusive Application?*

When the *Reconsideration* was issued, both HITN and DBCC had pending applications which were mutually exclusive. The *Reconsideration* provided that nonlocal parties with pending applications would have ninety days to transfer control to a local entity and then to amend their applications. Had HITN been aware of DBCC's competing application—*and* had it properly understood the *Reconsideration,* which reaffirmed the absolute preference for local applicants during the local priority period— it might conceivably have been able to amend its application. The FCC did issue a public notice announcing DBCC's application. For two reasons, HITN argues that the public notice was inadequate.

■ First, HITN argues that the FCC itself should have determined that the two applications were mutually exclusive and should have issued a public notice to this effect (prior to the time that HITN's opportunity to amend its application had ended). Current ITFS licensing procedures do involve the issuance of FCC notices listing mutually exclusive applicants.[8] At the time when DBCC's application was filed, however, the agency's practice was to issue public announcements of all ITFS applications and to require interested parties to determine for themselves which applications were mutually exclusive with their own. We believe that such a method of providing notice was fully sufficient to satisfy statutory and constitutional standards.

■ HITN also points out that DBCC's application was defective: it stated erroneously that no mutually exclusive applications were pending. HITN argues that the FCC's public notice was inadequate because, even if it had alerted HITN to examine DBCC's application, that application would have wrongly assured HITN that no conflict was present. Although we do not rest our holding on this point, we note that HITN does not claim any *actual* reliance on DBCC's application. It claims only that, if it had checked that application, it would have been misinformed, and that it therefore had no real *opportunity* to learn about the conflict and attempt to amend its own application.[9]

If the Commission had failed to follow its own rules regarding the issuance of public notices then HITN would clearly have a valid claim. *See Way of Life Television Network, Inc. v. FCC,* 593 F.2d 1356 (D.C. Cir.1979). The same principle might well apply if DBCC's application had been so substantially inaccurate as to afford HITN no meaningful opportunity to determine that the two applications were mutually exclusive. The FCC's public notice would appear to be adequate only if it alerted interested parties to documents which would allow them to determine whether their interests were implicated. In the present case, however, HITN was provided with adequate notice. The public notice issued by the Commission should have warned HITN that a B-group application had been filed for a Deland facility. It was HITN's responsibility to scrutinize DBCC's application to determine whether the two stations could coexist. Despite the mis-

---

**8.** *See* 47 C.F.R. § 74.911(c).

**9.** *See* Reply Brief for Appellant at 16 ("Even if HITN had studied DBCC's application it would not have been alerted....").

statement, the DBCC application contained sufficient information to signal a careful reader as to possible conflicts; HITN could easily have ascertained that DBCC's Deland station would be mutually exclusive with its own Orlando application.[10] Especially given the fact that DBCC's application was filed so shortly after HITN's, we believe that HITN could reasonably be expected to undertake some independent inquiry as to Orlando's proximity to Deland, and thus to determine that DBCC posed a threat to its interests.[11]

D. *Did the Grant of Twelve Channels to DBCC Violate the Commission's Rules?*

■ HITN also contends that the grant of twelve channels (the B-, D-, and G-group channels) to DBCC was a violation of the Commission's rules. FCC regulations provide that "[a] licensee is limited to the assignment of no more than four channels for use in a single area of operation.... An area of operation is defined as the area in which the use of channels by one licensee precludes their use by other licensees." 47 C.F.R. § 74.902(d). The four-channel limit may be waived, but Commission policy is that waivers "will be granted only where the applicant can overcome a heavy burden of proof." *Reconsideration,* 59 Rad. Reg.2d (P & F) at 1376. In any event, DBCC neither sought nor received a waiver. The Commission contends that the rule was not violated because the twelve channels allocated to DBCC were divided among four discrete areas of operation.

"We note as an initial matter that [HITN], in asserting that the agency has misconstrued its own standards, has assumed a heavy burden. An agency's inter-

pretation of its own regulations will be accepted unless it is plainly wrong." *General Carbon Company v. Occupational Safety and Health Review Commission,* 860 F.2d 479, 483 (D.C.Cir.1988). *See also United States v. Larionoff,* 431 U.S. 864, 872, 97 S.Ct. 2150, 2155, 53 L.Ed.2d 48 (1977); *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Wichita and Affiliated Tribes of Oklahoma v. Hodel,* 788 F.2d 765, 778 (D.C.Cir. 1986). Even under this highly deferential standard, however, we believe that the Commission's treatment of this issue cannot be sustained.[12]

■ The Commission's opinion stated that "[t]he [four-channel] rule was never intended ... to preclude the establishment of relay stations that are not designed to serve the same area and are, in fact, located in separate and distinct communities considerable distances apart, and which are necessary to retransmit the same programming from a central origination point to different receive sites in adjacent areas." 3 F.C.C. Rcd. at 1951 (J.A. 84) (citation omitted). The suggestion appears to be that a station's area of operation is to be equated with its intended audience, and that stations whose programming is directed at different communities are, *ipso facto,* located in different "areas." If the term "area of operation" were left undefined by the regulation, this might be a plausible construction. The regulation does define the term, however, and in quite a different way. Plainly it is not the case that a given ITFS station excludes other licensees from the use of the relevant channels only within the community that the station is intended to serve. The present controversy illus-

**10.** The letter ruling issued by the Chief of the Video Services Division stated that DBCC's application was "substantially complete" despite its failure to mention the pending HITN proposal. J.A. 33. We see no basis for rejecting that conclusion.

**11.** HITN contends that "HITN had every right to rely on DBCC's representation." Reply Brief for Appellant at 16. We note again that HITN does not claim any actual reliance on DBCC's statement that no B-group applications had been filed within fifty miles of its proposed Deland

station. Moreover, even actual reliance would not be dispositive. *See Washington Association for Television and Children v. FCC,* 665 F.2d 1264, 1271 n. 16 (D.C.Cir.1981).

**12.** The ensuing discussion focuses on the final Commission ruling in this case, the denial of reconsideration in *Daytona Beach Community College,* 3 F.C.C. Rcd.1951 (1988). J.A. 84. We note, however, that the agency's earlier letter rulings, *see* J.A. 22, 32–35, provide a no more satisfactory rationale for the conclusion that the four-channel rule had not been violated.

trates that point. DBCC's Deland station is intended to transmit programming to receive sites in and around Deland. Yet the station's area of operation would appear to include Orlando—over thirty miles away—since the Deland station would preclude the use of the B-group channels by HITN's proposed Orlando facility. In determining whether two stations share the same area of operation, it is simply not enough to ask whether they serve distinct audiences. The focus, in our view, must be on whether the stations' signals overlap in such a way that, within a substantial geographical region, prospective licensees would be precluded from the use of *both* groups of channels. We do not purport to hold that DBCC's proposed stations do create such areas of preclusion. Our point is simply that the FCC failed to undertake the inquiry.[13]

The Commission also stated that "the four-channel rule is inapposite in situations such as the one under consideration where the overlap occurs between an originating and relay station transmitting only four discrete channels of programming." 3 F.C. C. Rcd. at 1951 (J.A. 84). The suggestion appears to be that, even where a particular licensee's stations utilize more than four channels within a given area, the purposes underlying the rule are not implicated so long as only four channels of programming are presented. With respect, we believe that such a notion fundamentally misconceives the purposes behind the four-channel rule. The evil inherent in a licensee's "monopolization" of the spectrum does not lie in the danger that a single programmer will present too much information. The problem, rather, is that other applicants will be excluded from the airwaves, and that the range of programming available to the public will consequently be less diverse.[14] This threat to diversity is increased, not alleviated, when eight (or twelve) channels within a given region are closed to other potential licensees but only four channels of programming are presented. We therefore do not believe that a principled exception to the four-channel rule may be based simply on the fact that all of DBCC's stations are intended to transmit the same programming schedule.

■ We therefore must remand to the Commission for further consideration as to whether DBCC's proposed ITFS system would violate the four-channel rule. In so holding, we do not overlook the principle that on "a highly technical question ... courts necessarily must show considerable deference to an agency's expertise." *MCI Cellular Telephone Company v. FCC,* 738 F.2d 1322, 1333 (D.C.Cir.1984). Had the FCC rendered a technical judgment concerning the areas of preclusion produced by DBCC's proposed stations, and had it supported that judgment with even a modicum of reasoned analysis, we would be loath to second-guess the Commission's view absent highly persuasive evidence to

---

**13.** FCC counsel's responses at oral argument, though somewhat ambiguous, might be taken as assertions that no such overlap in fact exists. Even if counsel's statements had been wholly unequivocal, however, we could not affirm on this basis, since that was not the ground on which the agency relied. *See Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 50, 103 S.Ct. 2856, 2870, 77 L.Ed.2d 443 (1983) ("courts may not accept appellate counsel's *post hoc* rationalizations for agency action.... It is well established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself").

The FCC's opinion did state in passing that "the antenna patterns and proposed receive sites of the Deland and Daytona Beach stations produce overlapping areas of preclusion in limited areas in and around Daytona Beach and Deland." 3 F.C.C.Rcd. at 1951 (J.A. 84). Perhaps the Commission could reasonably determine that two stations are in different areas of operation if the overlap between their areas of preclusion is minimal (or "limited"). But this passing reference is plainly insufficient to sustain the agency's ruling. First, the Commission offered no basis for its view that the area of overlap would be limited. Moreover, the opinion said nothing about the extent to which signals from DBCC's other stations would overlap. Finally, the agency did not purport to decide the case on this basis.

**14.** In its *1985 Order* reaffirming the four-channel rule, the Commission explained: "This determination is due to the limited availability of and increased demand for ITFS channels, and will promote the diversity of services that can be provided by the greatest practicable number of ITFS licensees." 101 F.C.C.2d at 70.

the contrary.[15] The problem, as we see it, is that application of the four-channel rule calls for a technical judgment which the agency simply did not make. The Commission made no effort to define "the area in which the use of channels by [DBCC] precludes their use by other licensees." 47 C.F.R. § 74.902(d). It offered only the unsupported assertion that the four-channel rule does not apply to stations transmitting identical programming to different intended audiences. And it failed to justify that assertion by reference to principles consistent with the underlying logic of the four-channel rule. The Commission's decision therefore cannot be sustained.[16]

### III. CONCLUSION

We hold that the Commission properly interpreted the *Reconsideration* as granting an absolute preference to local applicants during the local priority period. We also conclude that HITN was not entitled to a comparative hearing, and that HITN received adequate notice of DBCC's mutually exclusive application. We do not believe, however, that the FCC's treatment of the four-channel rule can be sustained on the record before us. We remand to the Commission for further consideration of this issue.

*It is so ordered.*

---

15. Alternatively, the FCC might have adopted a rule which exempted relay stations from the four-channel limit. Or it might have defined the term "area of operation" by reference to a station's intended audience, rather than to the area from which other licensees would be excluded. Our point is simply that the FCC failed to undertake an inquiry which its own rule required.

16. The Commission contends that the exemption of relay stations from the four-channel rule is "well-established," *see* Brief for Appellee at 38, but in our view the relevant documents do not support that assertion. Although FCC rules plainly authorize the use of relay stations, *see* 47 C.F.R. § 74.931(d); *see also 1963 Report*, 39

F.C.C. at 853, the Commission has never stated that such stations are not subject to the four-channel limitation. Nor has it previously suggested that the "area of operation" of a relay station is to be defined other than by reference to 47 C.F.R. § 74.902(d).

The Commission also notes that "HITN [has not] pointed to any case involving a system similar to DBCC's which was resolved inconsistently with the outcome here." Brief for Appellee at 38. HITN's failure to cite supporting precedent is less damning than it might at first apear, since FCC counsel stated at oral argument that to her knowledge the agency had never before addressed this particular issue.