COSTA DE ORO TELEVISION, INC., Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents.

CoxCom, Inc., Intervenor.

No. 01–1153.

United States Court of Appeals, District of Columbia Circuit.

Argued March 18, 2002.

Decided June 28, 2002.

Barry A. Friedman argued the cause for the petitioner.

Joel Marcus, Counsel, Federal Communications Commission, argued the cause for the respondents. Jane E. Mago, General Counsel, Daniel M. Armstrong, Associate General Counsel, Federal Communications Commission, and Catherine G. O'Sullivan and Andrea Limmer, Attorneys, United States Department of Justice, were on brief.

Peter H. Feinberg and Scott Dailard were on brief for the intervenor.

Before: GINSBURG, Chief Judge, HENDERSON and TATEL, Circuit Judges.

Opinion for the court filed by Circuit Judge KAREN LeCRAFT HENDERSON.

KAREN LeCRAFT HENDERSON, Circuit Judge:

This case involves a dispute over the procedures the Federal Communications Commission (FCC or Commission) uses to determine local television market designations pursuant to the cable television mandatory carriage rules. In particular, Costa de Oro Television, Inc. (Costa) petitions for review of two FCC orders that sustain earlier market modification rulings but, at the same time, change the market definition mechanism. Costa also seeks review of the FCC decision promoting the use of certain data (the Longley–Rice signal strength prediction methodology maps) in market modification proceedings. Because we conclude that the Commission "articulated a rational explanation" for its decisions, *Eagle–Picher Indus., Inc. v. EPA,* 759 F.2d 905, 921 (D.C.Cir.1985), we deny Costa's petition.

## I. Background

### A. *Statutory and Regulatory Background*

Concerned that local television broadcast stations were no longer able to compete with the growing cable industry,[1] the Congress passed the Cable Television Consumer Protection and Competition Act of 1992 (Cable Act), 47 U.S.C. §§ 521 *et seq.* The Cable Act includes "must-carry" provisions that require "[e]ach cable operator" to carry the signals of a specific number of "local commercial television stations." 47 U.S.C. § 534(a).[2] A "local commercial television station" is defined as "any full power television broadcast station ... that, with respect to a particular cable system, is within the same television market as the cable system." 47 U.S.C. § 534(h)(1)(A). A local commercial television station that exercises its statutory must-carry right is entitled to cable carriage in its local market but it does not receive compensation therefor from the cable operator. The Cable Act also gives a broadcaster the option of cable carriage under a retransmission consent provision that permits the broadcaster and the cable operator to negotiate cable carriage arrangements and the broadcast station to receive compensation in return. *Id.* § 325(b). Every three years, the broadcaster is required to make an election between the must-carry and the retransmission consent options. *See id.* § 325(b)(3)(B). The first three-year cycle began in June 1993. 47 C.F.R. § 76.64(f)(1). A broadcast station's "market" is "determined by the Commission by regulation or order using, where available, commercial publications which delineate television markets based on viewing patterns." 47 U.S.C. § 534(h)(1)(C)(i). In 1992, the year the Cable Act was enacted, the Commission's rules, now codified at 47 C.F.R. § 76.55(e)(2), defined a station's market by reference to the Area of Dominant Influence (ADI) data produced by Arbitron, an audience research organiza-

---

1. *See* Congressional Findings and Policy: Cable Television Consumer Protection and Competition Act of 1992, Pub.L. No. 102–385, § 2(a), 106 Stat. 1460 (1992), *reprinted in* 47 U.S.C.A. § 521 note.

2. These provisions are found in section 4 of the Cable Act, adding new sections 614 and 615 to the Communications Act of 1934 (Communications Act), 47 U.S.C. §§ 151 *et seq.* In upholding the constitutionality of the must-carry provisions, the United States Su-

preme Court noted, "Congress sought to preserve the existing structure of the Nation's broadcast television medium while permitting the concomitant expansion and development of cable television, and, in particular, to ensure that broadcast television remains available as a source of video programming for those without cable." *Turner Broad. Sys., Inc. v. FCC,* 512 U.S. 622, 652, 114 S.Ct. 2445, 2464, 129 L.Ed.2d 497 (1994).

tion. *Id.* § 76.55(e)(1). The ADI describes a particular geographic television market based on measured viewing patterns. *See Report and Order and Further Notice of Proposed Rulemaking, Definition of Markets for Purposes of the Cable Television Broadcast Signal Carriage Rules,* 11 FCC Rcd 6201, 6203 ¶ 4, 1996 WL 277506 (1996), (*First Order*). In general, every American county is assigned to a discrete market according to those local-market stations with a preponderance of total viewing hours in the county. *Id.*

In December 1995, shortly after the first three-year election cycle ended, Arbitron discontinued its television ratings business and ceased publishing updated ADI data. In response and after notice and comment rulemaking, the FCC determined to continue to use the ADI market list for the 1996 election and to substitute Nielsen Media Research's television ratings service beginning with the 1999 election. *See First Order,* 11 FCC Rcd at 6206–07 ¶ 14. Nielsen uses a market designation called the "designated market area" (DMA). Both the ADI and the DMA use audience survey information from cable and noncable households to determine the assignment of counties to local television markets based on local stations' respective viewer shares. *Id.* at 6207–08 ¶ 16. Nonetheless, because of differences in methodology as well as sampling and statistical variation, the switch to the DMA-based market resulted in the reassignment of some counties. *Id.* Differences between the 1991–1992 ADI market list and the 1995–1996 DMA market list manifested a change in 126 markets with approximately 79 markets gaining counties and 83 markets losing counties. *Id.* at 6208–09 ¶ 18.

While a broadcast station's market is generally based on the ADI (now DMA) data, section 614(h) directs the Commission to consider an individual request for a change in market designation. The FCC may "with respect to a particular television broadcast station, include additional communities within its television market or exclude communities from such station's television market to better effectuate the purposes of this section." 47 U.S.C. § 534(h)(1)(C)(i). In considering such requests, the Commission "shall afford particular attention to the value of localism" by taking into account the following factors, among others:

> (I) whether the station, or other stations located in the same area, have been historically carried on the cable system or systems within such community;
>
> (II) whether the television station provides coverage or other local service to such community;
>
> (III) whether any other television station that is eligible to be carried by a cable system in such community in fulfillment of the requirements of this section provides new coverage of issues of concern to such community or provides carriage or coverage of sporting and other events of interest to the community;
>
> (IV) evidence of viewing patterns in cable and noncable households within the areas served by the cable system or systems in such community.

*Id.* § 534(h)(1)(C)(ii)(I)-(IV). Typically, a request is made either by a broadcast station wanting to be included as part of a cable system in a market outside its DMA designation or by a cable operator attempting to exclude a broadcast station from the cable operator's market. The Cable Act's legislative history recites as a rationale of the 614(h) market modification procedure that:

> where the presumption in favor of ADI [now DMA] carriage would result in cable subscribers losing access to local sta-

tions because they are outside the ADI in which a local cable system operates, the FCC may make an adjustment to include or exclude particular communities from a television station's market consistent with Congress' objective to ensure that television stations be carried in the areas which they serve and which form their economic market.

H.R. Rep. No. 102–628, at 97 (1992). During the period Arbitron's ADI market areas were in use, the Commission ruled on numerous market modification requests filed pursuant to section 614(h). *See, e.g., In re Complaints of Costa De Oro Television, Inc.,* 10 FCC Rcd 9468, 1995 WL 497381 (1995), *aff'd on recons.,* 12 FCC Rcd 22,464, 1997 WL 771052 (1997), *pet. for review denied, Costa de Oro Television, Inc. v. FCC,* 172 F.3d 919 (D.C.Cir.1998). The interplay between the FCC's earlier market modification decisions under the ADI regime and its move to a DMA-based market definition is the focus of Costa's appeal.

## B. History of Costa's License

Costa is the licensee of television station KJLA[3] located in Ventura, California. Ventura is in Ventura County. Although Arbitron included Ventura County in the ADI market for greater Los Angeles, it assigned KJLA to the Santa Barbara–Santa Maria–San Luis Obispo ADI market. Nielson, however, has always placed KJLA in the Los Angeles DMA. The change in market designation results in a corresponding change in KJLA's must carry right because a broadcast station generally has a right to carriage within its "market" only. While the Commission ordered carriage of KJLA throughout the Los Angeles market once the station was assigned

to that DMA, it continued to exclude certain communities that were the subject of earlier 614(h) market modification rulings. *See Costa de Oro Television, Inc.,* 15 FCC Rcd 15,069, 2000 WL 1145477 (2000); *Costa de Oro Television, Inc.,* 15 FCC Rcd 12,637, 2000 WL 913631 (2000).

As part of the ADI-to-DMA change, the Commission considered, and sought comment on, the continuing validity of its earlier 614(h) market modification rulings made using ADI data. Costa requested the Commission to reconsider *de novo* any prior section 614(h) ruling based on ADI data *if,* as in KJLA's case, the ADI-to-DMA change resulted in the reassignment of a station to a new market. In the *Second Report and Order on Definition of Markets for Purposes of the Cable Television Broadcast Signal Carriage Rates,* 14 FCC Rcd 8366, 1999 WL 329672 (1999), *(Second Order),* the Commission rejected Costa's request. It also decided to continue using ADI data to process any market modification request filed before the effective date of the change to DMA, that is, before January 1, 2000. In its *Second Order,* however, the FCC noted that, "[i]n cases in which the conversion to DMAs will have a direct consequence, we will take the future DMA assignment into account." *Second Order* ¶ 42. With respect to prior market modification rulings, then, "where the Commission has previously decided to delete a community from a station's ADI market, that deletion will remain in effect after the conversion to DMAs." *Second Order* ¶ 43. Costa petitioned for reconsideration and the FCC denied the petition, stating that "we continue to believe that the reasoned determinations reached in market modification

---

**3.** The station was formerly known by the call letters KSTV–TV. The call letters were changed to KJLA(TV) on July 20, 1998. *See* Call Sign Report No. 336, located at

http://www.fcc.gov/Bureaus/Mass_Media/Public_Notices/Call_Sign_Changes/pnmm8110.txt.

proceedings should not be upset as a result of the conversion to the DMA standard." *Order on Reconsideration on Definition of Markets for Purposes of the Cable Television Broadcast Signal Carriage Rules,* 16 FCC Rcd 5022, 2001 WL 203976 (2001), *(Reconsideration Order)* ¶ 17.

In the *First Order,* the Commission sought comment on measures to expedite the modification process by establishing more "focused and standardized evidentiary specifications." *First Order,* 11 FCC Rcd at 6225. It subsequently issued a list of information required to be included in each modification request. *Second Order,* 14 FCC Rcd at 8385–86 ¶ 44. Significant here, the *Second Order* also encouraged a petitioner to provide "a more specific technical coverage showing, through the submission of service contour prediction maps that take terrain into account, particularly maps using the Longley–Rice prediction methodology." *Id.* at 8388 ¶ 50. Costa's petition for reconsideration challenged the use of the Longley–Rice method as contrary to the intent of the Cable Act because it allegedly imposed an unreasonable financial burden by reintroducing the "UHF handicap." *See* Costa's Pet. for Recons. at 7; *see also Reconsideration Order,* 16 FCC Rcd at 5026 ¶ 11 n. 28 ("UHF handicap" refers to "the difficulty that UHF stations had in accessing all of their potential audience over the air because of the inferior signal propagation characteristic of the UHF band"). Without questioning the accuracy of the Longley–Rice maps, Costa's concern was that a cable company using Longley–Rice had "yet another quiver in [its] bow with which to avoid must-carry obligations." *Id.* In the *Reconsideration Order,* the Commission emphasized with regard to Longley–Rice that "it is frequently important in the market modification process to find as precisely as possible the contours formed by a

station's signal." *Reconsideration Order,* 16 FCC Rcd at 5027 ¶ 13–14.

Costa petitions for review of portions of both the *Second Order* and the *Reconsideration Order.*

## II. Analysis

We review the Commission's orders "under the deferential standard mandated by section 706 of the Administrative Procedure Act, which provides that a court must uphold the Commission's decision unless 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.'" *Achernar Broad. Co. v. FCC,* 62 F.3d 1441, 1445 (D.C.Cir.1995) (quoting 5 U.S.C. § 706). In this task, we do not substitute our judgment for that of the agency but rather look to see whether its decision is based on a "consideration of the relevant factors and whether there has been a clear error of judgment." *Damsky v. FCC,* 199 F.3d 527, 533 (D.C.Cir.2000) (citations omitted); *see Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 42–44, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). Applying this standard, we conclude that the Commission did not act arbitrarily in deciding not to reconsider its prior market modification rulings.

Costa argues that with respect to a station that, like KJLA, has changed markets, any prior market modification ruling made under the ADI standard is obsolete. The FCC responds that market modification decisions turn on fact-specific assessments of the four section 614(h) factors, *see supra* p. 125, irrespective of the initial ADI or DMA market designation, and, therefore, a change in market assignment does not change the Commission's assessment of a station's "true market." Nonetheless, Costa asserts, initial market designations "exert broad influence over market modification proceedings by determining the pre-

sumption of carriage and the allocation of burden of proof," *see* Reply Br. at 5. Because the prior market modification rulings could not have considered a station's *DMA* market designation and consequent "carriage" presumption, Costa urges, the FCC acted arbitrarily in not reconsidering them.

Both sides agree that generally a broadcast station has a presumptive must-carry right in the ADI/DMA market in which it is located. Costa, however, overstates the continued importance of· the initial designation once a broadcaster or cable operator requests a section 614(h) market modification ruling. Based on the statute's plain language, the FCC modifies a market with "particular attention to the value of localism" by applying the factors listed in section 614(h)(1)(C)(ii) to the *specific circumstances* of the station and community. In contrast, a station's ADI/DMA market designation is merely the initial empirical assessment of the station's market. In its *Implementation of the Cable Television Consumer Protection and Competition Act of 1992*, the Commission stated:

> Section 614(h)(1)(C) of the 1992 Act permits the Commission to add to or subtract communities from a station's television market to better reflect the marketplace conditions following a written request. The Commission also may determine that particular communities are part of more than one television market. The procedures recognize that ADI markets may not always accurately reflect the area in which a particular television station should be entitled to cable carriage, and will help ensure that disruption to subscribers over the

broadcast signals they receive is minimized.

8 FCC Rcd 2965, 2976 ¶ 42, 1993 WL 756287 (1993). In response to a section 614(h) request, the Commission assesses the initial ADI (now DMA) market assignment using the statutory factors, including whether the station provides coverage or other local service to the community. To be sure, because a broadcast station enjoys a presumption of carriage in the ADI or DMA in which it is located, the initial market designation may dictate which party has the burden of seeking modification. For example, ʾa cable operator in the Los Angeles market must make a section 614(h) request indicating that Costa does not serve the community (within the Los Angeles market) in order to exclude Costa from the cable system's channel lineup for that community. Once the cable operator comes forward, the FCC must evaluate whether the "value of localism" (within the meaning of section 614(h)) is met by permitting the cable operator to exclude Costa *from that community* notwithstanding Costa's DMA assignment to the Los Angeles market.[4] There is no evidence that any prior market modification ruling was based solely on the initial market designation nor can Costa demonstrate that the cable operator must shoulder anything more than the burden of production. Because the ADI modification rulings turned on the statutory factors rather than on KJLA's Santa Barbara or Los Angeles initial market designation, we conclude that the Commission acted reasonably in rejecting Costa's invitation to revisit the same factors.

Moreover, even if the initial market designation does "color the entire tenor of the modification process" in some respect,

4. The Los Angeles market is geographically large, stretching approximately 300 miles north to south and 250 miles east to west. FCC Br. at 7 (citing *Media One of Los Angeles, Inc.*, 15 FCC Rcd 19,386, 19,393, 2000 WL 1459407 (2000)). Ventura County, where KJLA's transmitters are located, lies in the northwestern part of the market separated from most of the market by several mountain ranges.

Costa Br. at 14, the Commission, beginning with its *First Order*, has pledged to consider a station's current DMA assignment as part of any future section 614(h) proceeding. *See Second Order*, 14 FCC Rcd at 8384 ¶ 42 ("In cases in which the conversion to DMAs will have a direct consequence, we will take the future DMA assignment into account, as we have done since the *First Order* was released."). To the extent Costa disputes whether the FCC will adequately weigh its current DMA assignment in a future modification ruling, that ruling will be subject to review by this Court at the appropriate time with the benefit of the facts of record.[5] Furthermore, the Commission's desire "to avoid disturbing settled expectations," *Reconsideration Order*, 16 FCC Rcd at 5028 ¶ 17, further convinces this court that the Commission's decision to let the prior modification rulings stand does not constitute a "clear error of judgment." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, 103 S.Ct. at 2867 (citations omitted).

■ Finally, Costa's challenge to the Commission's decision to encourage use of Longley–Rice maps misses the mark. At oral argument, Costa appeared to maintain that the Commission must rely on Grade B contour maps (even if Longley–Rice maps more accurately assess a station's signal) simply because a cable operator may use Longley–Rice maps to exclude broadcast stations. A Grade B contour map shows the area in which 50 per cent of television sets receive a viewable signal *via* antenna 50 per cent of the time. *See* 47 C.F.R. § 73.684 (1997). The Grade B contour map, however, indicates only "the approximate extent of coverage over average terrain in the absence of interference from other television stations." *See id.* § 73.683(a) (2002); *see also ACLU v. FCC*, 823 F.2d 1554, 1560–61 n. 8 (D.C.Cir.1987) (Grade B contour "is based on general engineering principles, and does not take into account site-specific factors that could affect the actual broadcast signal strength in a community"). In contrast, the Longley–Rice model "provides a more accurate representation of a station's technical coverage area because it takes into account such factors as mountains and valleys that are not specifically reflected in a traditional Grade B contour analysis." *Second Order*, 14 FCC Rcd at 8388 ¶ 52. In determining whether a television station in fact provides "coverage or other local service" to a community, the Longley–Rice model enables the Commission to assess this section 614(h) factor with the best available evidence. The Commission has plainly provided "more than [the] modicum of reasoned analysis" required to affirm its decision to promote the use of Longley–Rice maps in market modification proceedings. *Hispanic Info. & Telecomms. Network, Inc. v. FCC*, 865 F.2d 1289, 1297–98 (D.C.Cir.1989). Moreover, the Commission's conclusion that Longley–Rice maps are more accurate than Grade B contours is "precisely the type of technical issue on which we defer to the Commission's expertise." *Keller Communications v. FCC*, 130 F.3d 1073, 1077 (D.C.Cir.1997) (citing *MCI Cellular Tel. Co. v. FCC*, 738 F.2d 1322, 1333 (D.C.Cir.1984)). Regarding

---

5. Costa points to a prior market modification ruling to demonstrate the importance of the initial market designation. *See In re Petition of Costa de Oro Television, Inc. for Modification of Market*, 13 FCC Rcd 4360, 1998 WL 75284 (1998). There, the FCC stated that it generally uses an "extra measure of caution" when a "station from one market is proposing to obtain mandatory carriage rights in the core of another market." *Id.* at 4374 ¶ 29. It then concluded, however, that "this concern" has "less significance here than it might in other cases," *id.*, acknowledging the fact that Costa's prospective DMA assignment to the Los Angeles market would moot the issue.

Costa's concern that in some instances the Grade B contour maps may give more accurate assessments of a station's coverage, we find the Commission's response in its *Reconsideration Order* sufficient: "The Second Report and Order encourages parties to provide maps using the Longley–Rice methodology. They are not *required* to do so. Parties may submit traditional Grade B contour maps in addition to, or instead of, Longley–Rice maps and may explain why they believe Grade B analysis is more relevant." *Reconsideration Order,* 16 FCC Rcd at 5027 ¶ 50 (emphasis added).

For the foregoing reasons, Costa's petition for review is

*Denied.*